# EXHIBIT 3

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place, Boston, MA 02108**
**Phone: (617) 994-6000 Fax: (617) 994-6024**

---

MCAD DOCKET NUMBER: 24BEM03030          EEOC/HUD CHARGE NUMBER: 16C-2024-02920
FILING DATE: 09/16/24                    VIOLATION DATE: 05/24/24

---

Name of Aggrieved Person or Organization:
Katherine Merrill Dunham
511 Elm Street
Concord, MA 01742
Primary Phone: (978)399-9360

---

Named is the employer, labor organization, employment agency, state/local government agency, or other entity who discriminated against me:
WBZ-TV
Attn: Human Resources/Legal Department
1170 Soldiers Field Road
Allston, MA 02134
Primary Phone: (617)787-7000

Columbia Broadcasting System Inc.
c/o Prentice-Hall Corporation
84 State Street
Boston, MA 02109
Primary Phone: (617)787-7000

Paramount Global, Inc.
c/o Corporation Service Company
84 State Street
Boston, MA 02109
Primary Phone: (617)787-7000

Justin Draper
WBZ-TV
Attn: Human Resources/Legal Department
1170 Soldiers Field Road
Allston, MA 02134
Primary Phone: (617)787-7000

Michael Roderick
Paramount Global, Inc.
c/o Corporation Service Company
84 State Street
Boston, MA 02109
Primary Phone: (617)787-7000

No. of Employees:       25+

Work Location: Boston, MA

---

Cause of Discrimination based on:
Sex (Female); Race/Color (White); Retaliation.

---

**The particulars are:**

MCAD Docket Number 24BEM03030, Complaint

I, Katherine Merrill Dunham, the Complainant, believe that I was discriminated against by Respondents WBZ-TV, Columbia Broadcasting System Inc., Paramount Global, Inc., Justin Draper, and Michael Roderick, on the basis of Sex, Race/Color, and Retaliation. This is in violation of M.G.L. c. 151B, Section 4, Paragraphs 1, 4 and 4A, and Title VII of the Civil Rights Act of 1964, as amended.

See Attached Particulars.
--------------------------------------------------------------------------------------------------------------------------------------
I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein are true to the best of my knowledge.

_____
(Signature of Complainant)

MCAD Docket Number 24BEM03030, Complaint

| | |
|---|---|
| Form Name: | MCAD eComplaint Filing |
| Submission Time: | September 16, 2024 9:15 pm |
| Browser: | Chrome 128.0.0.0 / Windows |
| IP Address: | 73.249.201.227 |
| Unique ID: | 1266250670 |
| Location: | 42.6219, -70.6762 |

## 1. Introduction

| | |
|---|---|
| **Choose your role** | I am a Massachusetts Licensed Attorney filing on behalf of the Complainant |

## 2. Attorney / Duly Authorized Representative Contact Information

| | |
|---|---|
| **Name of Attorney or Duly Authorized Representative** | Patricia Washienko |
| **Email** | pwashienko@washienkolaw.com |
| **Phone** | (617) 723-0008 |
| **Business Address** | 211 Congress Street, Suite 720 Boston, MA 02110 |

## 3. eComplaint Filing

| | |
|---|---|
| **Select the MCAD Office where you want to send your submission** | Boston |
| **Name of Complainant** | Katherine Merrill Dunham |
| **Please confirm that the submission includes the following documents in one PDF** | Notice of Appearance Complaint of Discrimination Complainant Verification (Complaint filed under pains and penalties of perjury) |
| **File** | https://www.formstack.com/admin/download/file/16921306504 |
| **Check this box to indicate that you agree to the MCAD terms and conditions above.** | I agree to the MCAD terms and Conditions |
| **Attorney / Duly Authorized Representative Signature** | |



**WASHIENKO LAW GROUP LLC**
211 CONGRESS STREET | SUITE 720 | BOSTON, MA 02110
617.723.0008 PHONE | 617.723.0009 FAX | WWW.WASHIENKOLAW.COM

PATRICIA A. WASHIENKO, ESQ.
patricia@washienkolaw.com | EXT. 101

September 16, 2024

*Via MCAD eComplaint Filing Portal for Attorneys and Duly Authorized Representatives
(https://massgov.formstack.com/forms/mcad_ecomplaint_filing_portal)*

Massachusetts Commission Against Discrimination
One Ashburton Place
Sixth Floor, Room 601
Boston, MA  02108

Re:    Katherine Merrill Dunham v. WBZ-TV, et. al.

Dear Sir/Madam:

Enclosed please find for filing the following documents:

1. Complainant's Charge of Discrimination in the above referenced action;
2. Exhibits A-H to Complainant's Charge of Discrimination;
3. Counsel's Notice of Appearance; and
4. Email verification from the Complainant stating that the Complaint is made under the pains and penalties of perjury.

Your attention to this matter is greatly appreciated.  If you have any questions or concerns, please do not hesitate to contact me.

Very truly yours,

Patricia A. Washienko

PAW/alw
Enclosures
cc:    Katherine Merrill Dunham

CHARGE OF DISCRIMINATION
MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

FEPA NUMBER:                          FILING DATE: September 16, 2024

EEOC NUMBER:                          VIOLATION DATE:  May 17, 2024

NAME OF AGGRIEVED PERSON OR ORGANIZATION

Katherine Merrill Dunham          TELEPHONE NUMBER
511 Elm Street                           HOME/MOBILE: (978) 399-9360
Concord MA 01742

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, OR
STATE/LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME

WBZ-TV                                      TELEPHONE NUMBER: (617) 787-7000
1170 Soldiers Field Road              NO. OF EMPLOYEES:  over 300
Boston, MA 02134
Daniel.Paretsky@paramount.com

Columbia Broadcasting System Inc.     TELEPHONE NUMBER: (617) 787-7000
c/o Prentice-Hall Corporation          NO. OF EMPLOYEES: over 300
84 State Street
Boston, MA 02109
Daniel.Paretsky@paramount.com

Paramount Global, Inc.                  TELEPHONE NUMBER: (617) 787-7000
c/o Corporation Service Company      NO. OF EMPLOYEES: over 300
84 State Street
Boston, MA 02109
Daniel.Paretsky@paramount.com

                                             TELEPHONE NUMBER: (617) 787-7000
Justin Draper                            NO. OF EMPLOYEES: N/A
c/o WBZ-TV
1170 Soldiers Field Road
Boston, MA 021345
Jdraper@cbs.com

1

Michael Roderick
Paramount Global, Inc.
c/o Corporation Service Company
84 State Street
Boston, MA 02109
Michael.Roderick@paramount.com

TELEPHONE NUMBER: (617) 787-7000
NO. OF EMPLOYEES: N/A

CAUSE OF DISCRIMINATION BASED ON:    RACE, in violation of M.G.L. c. 151B § 4(1) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.; GENDER in violation of M.G.L. c. 151B § 4(1) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.; INTERFERENCE in violation of M.G.L. c. 151B § 4(4A); and RETALIATION in violation of M.G.L. c. 151B § 4(4).

THE PARTICULARS ARE:

1.    I am a White woman.

2.    I began my broadcasting career at Fox affiliate WICZ-TV in Binghamton, New York, in 1996. I then served as an anchor/reporter at ABC affiliate WKRN-TV in Nashville, where I earned my first Emmy Award for my role in covering the tornado that hit Tennessee in 1999. I left WKRN in 2003 and served as a reporter at WNBC-TV in New York until 2004.

3.    In 2004, I joined WBZ-TV as a reporter in Boston, Massachusetts. WBZ-TV is a subsidiary of Columbia Broadcasting System Inc., and WBZ-TV and Columbia Broadcasting System Inc. are wholly-owned subsidiaries of Paramount Global, Inc. All entities were my employer(s).

4.    During my time at WBZ-TV, I covered virtually every big story in New England: the 2004 Democratic National Convention in Boston, the 2004 Red Sox World Series win and several Patriots Super Bowls, often live from the field, and the 2013 Marathon bombings, among others. I broke hundreds of exclusive stories. I earned three additional Emmy Awards, an extraordinary reputation and had an unblemished employment record.

5.  WBZ-TV promoted me regularly every few years (reporter to anchor, then to anchor of more important newscasts) and, in 2016, I was the lead 11 p.m. reporter and weekend anchor.

6.  In 2017, I was named co-anchor for WBZ This Morning and WBZ News at Noon. In the press release announcing my promotion, Johnny Green, Jr., WBZ's News Director at the time, said that my "experience and expertise, along with [my] passion and understanding of Boston and its people, makes [me] a fantastic anchor" and that WBZ was thrilled to have me assume the role as co-anchor.[1] Mr. Greene, Jr., who is Black, has been one of my dearest work friends and closest confidants for close to a decade.

7.  In my lengthy career as a public figure, I have never been accused of racism or exhibiting microaggressions or unconscious bias. To the contrary, I have educated myself on issues of systemic racism, microaggressions and unconscious bias. I am anti-racist and that is evident in my professional and personal life. Throughout my career, I have intentionally advocated for and produced hundreds of segments highlighting many of the significant contributions persons of color make in our communities. I did stories like this weekly for years while on the morning show.

8.  At my suggestion (and as a result of my advocacy), WBZ aired a promotional segment focused on my relationship with Sharon Curry, the (Black) floor manager at the Red Cross Boston Food Pantry, whom I have known for years; WBZ also aired a promotion segment focused on Jerry Moss, my daughter's swim coach, who was also my high school gym teacher and mentor (to me and generations of students) and was highlighted for being such an important role model in my life.

9.  Many of my colleagues of color agree.

    a.  Indeed, for more than 20 years, I have worked closely, virtually daily, with all my colleagues, regardless of race (or any other protected category). I have opened the doors to my home to all my colleagues, regardless of race (or any protected category), and I have mentored any person – regardless of race (or any protected category) – who reached out and asked for my assistance trying to establish themselves in broadcast news, including, for example, former CBS MoneyWatch National reporter Diane King Hall, who is Black, and who visits me and my family every summer and stays at my home. Ms. King Hall's son calls me "Auntie Kate."

10. CBS, on the other hand, has a tortured history of racism.

---

[1] *Kate Merrill Named Anchor For 'WBZ This Morning'*, CBS NEWS (Jan. 18, 2017), available at https://www.cbsnews.com/boston/news/kate-merrill-named-anchor-for-wbz-this-morning/

3

11.    In 2019, a veteran of the company's news and entertainment divisions, publicly alleged that CBS had a "White problem," and others came forward to report a toxic, racist environment. Upon information and belief, CBS acted quickly in response, reportedly implementing a number of changes to increase diversity. For example:

    a.    In 2020, CBS Entertainment Group set a goal to ensure that by "the 2022-2023 broadcast season: half of all writers will be nonwhite."[2]

    b.    CBS Entertainment Group also adopted an initiative requiring 50% of the cast members on their reality shows to be Black, Indigenous, or People of Color ("BIPOC").[3]

    c.    CEO of CBS Entertainment Group, George Cheeks, "set a goal that all writers' rooms on the network's primetime series be staffed 40 percent BIPOC in the 2021-22 season; 17 out of 21 shows hit or exceeded that target," according to a 2022 article quoting Mr. Cheeks.[4]

12.    Upon information and belief, in early 2021, CBS also hired an independent third-party to investigate allegations of racism, sexism and abusive behavior at various news stations throughout the country.  During the investigation additional allegations of racism, sexism, and abusive behavior came to light: among other things, female managers reported that they had been bullied and Black journalists reported that they had denied opportunities.[5]

13.    On or about July 22, 2021, shortly after the third party investigation into the issues of racism and sexism had concluded, CBS Entertainment Group head George Cheeks acknowledged that "there are clear themes that we need to address moving forward: **our diversity, equity and inclusion standards need to be a top priority for leadership in every corner of our Stations business; our workplace culture needs to measurably**

---

[2] Christie D'Zurilla, *CBS Announces Diversity Overhaul of Writers Rooms and Script-Development Program*, LOS ANGELES TIMES (Jul. 13, 2020), https://lat.ms/3Sj1t4O.

[3] Sarah Whitten, *CBS Reality Shows Must Now Have 50% Non-White Casts, Network Says*, CNBC (Nov. 9, 2020), available at https://cnb.cx/3Sihh7W.

[4] Lynette Rice, *Altered Reality*, ENTERTAINMENT WEEKLY (Feb. 2, 2022), available at https://bit.ly/3SFs3WU.

[5] Dominic Pattern, *CBS Concludes Probe into Racist, Abusive Conduct At Stations; "Difficult Period," George Cheeks Says; L.A. & Chicago Managers Out,* DEADLINE (July 22, 2021), available at https://deadline.com/2021/07/cbs-racist-abusive-probe-ends-firings-george-cheeks-wendy-mcmahon-emails-la-chicago-1234798353/

**improve; and, your trust needs to be restored with your CBS leaders**."[6] (Emphasis in original.)

14.    On or about July 22, 2021, Wendy McMahon, head of CBS News (and Mr. Draper's former wife), similarly announced to staff members in an email that the investigation had concluded and reported that the organization was seeking new general managers for two stations.[7]

15.    In accord with the marching orders from the top down, CBS continued to work to redress its dismal history. In its efforts to do so, however, I believe that CBS engaged in reverse discrimination.

      a.    For example, shortly after the results of the 2021 investigation were announced, Adrienne Roark, head of East Coast stations for CBS, including WBZ, began stating to managers and others at WBZ that the Morning Show was not diverse. She repeatedly said it was "too white," that WBZ was "the least diverse station for on air talent" and the "whitest of all their stations" (or words to that effect) and that it (i.e., its personnel) had to change. Upon information and belief, Ms. Roark informed managers that she would allow only minority hires. Also upon information and belief, a number of managers complained that Ms. Roark had handcuffed hiring when they had no minority candidates and a qualified White candidate, whom they were not permitted to hire.

      b.    Similarly, in or around June 2022, Ms. Roark (and Justin Draper, President and General Manager of WBZ) fired the former WBZ News Director Jessi Miller, a White woman in her late 40s who had more than 20 years of experience at WBZ, and replaced her with Gerardo Lopez, a younger Hispanic, gay man with far less experience in news and zero experience in the Boston market. Mr. Lopez told me on several occasions that Ms. Roark was upset with the lack of diversity on the Morning Show.

16.    The New York Post reported that in 2021, multiple employees complained about reverse discriminatory hiring and management practices at CBS. Among the explosive claims set forth in the New York Post included that Ingrid Ciprian-Matthews, a Black woman and then CBS News President, supported the promotion of an African American correspondent notwithstanding that she had personally witnessed him

---

[6] Id.

[7] Id.

verbally abusing a female colleague.[8] According to the New York Post, employees also accused Ms. Ciprian-Matthews of making up phony excuses to replace a White reporter with an African American for a plum assignment covering the aftermath of the Capitol riots.[9] The New York Post also reported that, in yet another instance, a White job candidate claimed that Ms. Ciprian-Matthews told her it would be easier to hire her if she were a "different color" and passed her over for the role.[10]

17.   The New York Post also reported that in mid-2021, CBS's parent company, Paramount Global, launched an investigation into Ms. Ciprian-Matthews.[11] According to the New York Post, Jennifer Gordon, an executive vice president of employee relations at Paramount Global who conducted the HR probe, cut the investigation short and failed to interview key witnesses before she concluded that Ms. Ciprian-Matthews was a merely "bad manager" with limited resources.[12] Upon information and belief, CBS did not demote Ms. Ciprian-Matthews, nor did it terminate her employment.

18.   In the meantime, CBS's corporate diversity directive continued to play out in Boston (and elsewhere[13]). For example, in July 2022, WBZ hired Courtney Cole, who is Black, as an anchor and reporter, to replace Nick Giovanni – a White male – who was demoted to a full-time reporter. Also in 2022, WBZ hired Chris Tanaka, who is Japanese American, as a co-anchor.

19.   During this time, I focused on performing my job well. I supported all my colleagues and continued to act as a mentor to more junior staff members who requested my advice, regardless of their races (or any other protected category). I also embraced the network's diversity efforts. I was concerned, however, that WBZ-TV was not supporting many of my less experienced and recently hired colleagues, a number of whom were persons of color.

---

[8] Alexandra Steigrad, *'Woke' CBS News president got job despite HR probe over bias accusations, sidelining white journalists: sources,* NEW YORK POST (Jan. 9, 2024), available at https://nypost.com/2024/01/09/media/new-woke-boss-at-cbs-news-got-top-job-despite-hr-probe-sources/

[9] Id.

[10] Id.

[11] Id.

[12] Id.

[13] Jeff Vaughn, for eight years a news anchor at CBS's Los Angeles affiliate, has sued CBS and Paramount (and Ms. McMahon) alleging reverse race discrimination in connection with his termination in September 2023 and subsequent replacement by a less experienced Black man. A copy of the lawsuit, *Vaughn v. CBS,* is attached as **Exhibit A**.

20.    Throughout 2023, Mr. Lopez told me (in several conversations) that he wanted to move my co-anchor Liam Martin, a White male, off the Morning Mix 9am show and replace him with Ms. Cole because the show was not diverse enough. Mr. Lopez then started having Ms. Cole substitute on the morning show instead of Breana Pitts, a White anchor who had been the fill-in for years and was much more experienced than Ms. Cole. Ms. Cole also filled in ahead of weekend Morning Anchor Anna Meiler, who is White, had a longer tenure at WBZ, and also was a more experienced anchor.

21.    On or about March 31, 2023, because I had become quite concerned about the lack of support and resources WBZ was providing for our new talent, a number of whom were persons of color, I met with Lori Orlando, Senior Vice President, Talent, to report my concerns. (At that time, I perceived both that Katrina Kincaid, a junior Black reporter, was about to quit her job at WBZ and that Ms. Cole was struggling in her anchor role.) I informed Ms. Orlando that Mr. Lopez and Mr. Draper did not appear to be helping Ms. Kincaid or Ms. Cole be successful, nor providing either woman with support. I vividly recall stating to Ms. Orlando that although WBZ was hiring persons of color and bringing diversity to the station, it was failing to provide support to these new members of our team to ensure their success. I stated the station needed to do so, and doing so was vital for the station's success. To the best of my memory, Ms. Orlando stated to me that she had hired Ms. Cole as a weekend anchor (rather than a weekday anchor) because she (Ms. Cole) was not experienced enough for a full-time Monday through Friday anchor role and, in fact, was not meant to be a full-time Monday through Friday anchor. Notwithstanding Ms. Orlando's words, I am not aware that WBZ took any action to provide more support to Ms. Cole, Ms. Kincaid, or others of its new talent.

22.    In or around June 2023, WBZ promoted Tiffany Chan (who is Asian) to the role of weekend Anchor over several other White candidates with more experience.

23.    In August 2023, meteorologist Zack Green, who is White, was let go from WBZ (but made to work through October 2023 due to a staffing shortage), although he had never been warned about any performance deficiencies. WBZ had already hired Jason Mikell, who is Black and a considerably less experienced television meteorologist, to replace Mr. Green when he was fired. As Mr. Green had been very highly regarded by WBZ viewers, a significant number of WBZ's viewers were unhappy about the way Mr. Green had been terminated, and I suggested to Mr. Draper that he might want to find ways to protect Mr. Mikell from likely viewer backlash. Mr. Lopez and Sean Barnacoat, WBZ's Creative Services Director, suggested WBZ put "space" (*i.e.*, time) between Mr. Green's (ugly) termination and Mr. Mikell's hire.

24.    When Mr. Mikell started working at WBZ, he informed me that he had never been to Boston before relocating for the job at WBZ. As he was new to the area, I offered to introduce him to my friends and acquaintances in Boston.

        a.    Thereafter, I continued to interact warmly with Mr. Mikell. The warm tenor of my interactions is reflected in my ongoing text message exchanges with Mr. Mikell, a sample of which is set out at **Exhibit B**.

25.    Also in August 2023, and notwithstanding CBS's six-month long investigation in 2021 into allegations of her discriminatory management and hiring practices, Ms. Ciprian-Matthews was promoted to CBS News President, overseeing all CBS News programs, bureaus, global newsgathering, streaming and digital editorial, as well as standards and practices, special events, politics, elections and surveys, social, the race and culture unit and CBS News Radio.

26.    On February 22, 2024, Mr. Mikell made a wildly inappropriate sexual innuendo about me on air. Specifically, he implied that my co-anchor and I had sexual relations at a gazebo described as for lovers. My Executive Producer complained to News Director Mr. Lopez that Mr. Mikell had been inappropriate on air and showed him the videotape of the incident. Mr. Lopez did nothing, however, and Mr. Mikell was not disciplined for his sexually charged remark about me.

27.    Despite my dismay at this inappropriate sexually charged comment, I continued to support Mr. Mikell in his new role. When Terry Eliasen (WBZ's Weather Executive Producer) told me he was concerned about Mr. Mikell's performance and asked for my help to support him (Mikell), I agreed to do so. Screenshots of several of my texts with Mr. Eliasen regarding supporting Mr. Mikell are attached as **Exhibit C**. (My text to Mr. Eliasen included a segment of my text thread with Mr. Mikell telling him that he was doing a great job. That segment is set out below for convenience.)



28.  Near the end of March 2024, Ms. Kincaid quit her job at WBZ. I am reliably informed and believe that Mr. Draper expressed relief to an executive producer that she was no longer on the morning show, because she had struggled so much.

29.  Meanwhile, I continued to perform well, and my ratings were overwhelmingly positive. I maintained excellent relationships with my colleagues.

30.  On April 3, 2024, during a commercial break, I gently and privately (via text message) corrected Mr. Mikell's on-air pronunciation of a local town name (Concord) during his weather segment. (Mr. Mikell, who is from southern Mississippi, informed me when he joined WBZ that he was unfamiliar with the pronunciation of the names of local cities and towns, and asked me to assist him with pronunciation. As providing pronunciation tips is a courtesy that people in the industry extend to colleagues to help them relocate to a new market, I agreed.) A screenshot of my text to Mr. Mikell re: his pronunciation is attached at **Exhibit D**.

31.  Notwithstanding Mr. Mikell's request for my assistance with pronunciation of local town names, and the fact that I texted him privately regarding his pronunciation of the name of the town Concord, Mr. Mikell immediately publicly confronted me, loudly yelling at me on the studio floor and asserting that I was "critical" of him. His tone was so aggressive and unprofessional that I immediately lodged a complaint with WBZ's Human Resources department.

32.  My colleague Jordyn Jagolinzer, who was working as the fill-in traffic reporter on April 3, 2024 (the day Mr. Mikell publicly confronted me), personally observed Mr. Mikell's conduct toward me that day. Ms. Jagolinzer contemporaneously texted Breana Pitts, who is also on WBZ's Morning Team, about Mr. Mikell's behavior, remarking: "She [Kate] texted him I guess like how to pronounce [C]oncord cause he said it wrong[.] [H]e literally walks over and freaks out[.]" and "Literally I had no idea these texts were going on[.] Jason just gets upset and like flips out, like so unprofessional." and "I was like is he really starting an argument in front of everyone – mic'd up. . ." (Screenshots of Ms. Jagolinzer's text thread with Ms. Pitts is attached hereto at **Exhibit E**.)

33.  On April 10, 2024 (i.e., a week after I complained about Mr. Mikell's behavior aggressively, loudly, and publicly confronting *me* on the studio floor), Michael Roderick, Vice President, Employee Relations at Paramount, informed me that an investigation was being conducted into allegations that I treated coworkers differently because of their race. I was shocked and in utter disbelief, not only because I have never been accused of racism (and, in fact, am fully committed to anti-racism) but also because he was not investigating *my* complaint about Mr. Mikell's behavior toward me on April 3, 2024. Based on Mr. Roderick's questions, it was apparent to me that Mr. Roderick had already spoken with Mr. Mikell, who had apparently claimed that I was "always" critical of him. In other words, the first time that my complaint

*about* Mr. Mikell's behavior on April 3, 2024 was even acknowledged was in connection with an investigation that Paramount Employee Relations was conducting into a complaint *about me*. My complaint about Mr. Mikell's aggressive confrontation of me had apparently been cast aside, as had my Executive Producer's earlier complaint to the News Director Mr. Lopez about Mr. Mikell's wildly inappropriate on-air sexually-charged innuendo about me.

34.    As an example of my being racist, Mr. Roderick explained that when I welcomed Mr. Mikell to Boston, I told him that he would "find your people," which he found offensive. I explained to Mr. Roderick that I had offered to introduce Mr. Mikell to people his age without children, and who lived in the city, unlike me. I clarified that my comment was not in any way related to race; I was saying that Mr. Mikell would undoubtedly find friends he could socialize with (who were not middle-aged women who lived in the suburbs and had kids). I also informed Mr. Roderick that I offered to introduce Mr. Mikell to my friends and acquaintances in Boston, and that I had welcomed him to meet and socialize with my family in the suburbs.

35.    Based on Mr. Roderick's comments, I understood that Mr. Mikell had also complained that I did not ask him about his weekends, implying that I did not ask about his weekends because he was (is) Black. I informed Mr. Roderick that I did not choose not to ask Mr. Mikell about his weekends because of his race; I explained that I was so busy doing my job that I didn't have time to ask *anybody* about their weekends. (I informed Mr. Roderick that I was so busy that I generally did not even eat breakfast for the first seven hours of my shift.) By the time my shift had quieted, Mr. Mikell had left the studio.

36.    Mr. Roderick also asked about a comment I made during one newscast's wrap up following the Morning Show's "Do Your Job" segment. While live on air, just as Mr. Mikell was finishing a "Do Your Job" segment as chair lifter operator at Wachusett Mountain ski area, producers Aileen Pollard and Victoria Love instructed me and my co-anchors to make a "Dirty Job" reference. (Dirty Jobs was a long-running and award-winning reality tv show.) In response to the producers' instruction to refer to a dirty job, I suggested garbage collection while Mr. Tanaka suggested that Mr. Mikell could work in the fields. During my interview with Mr. Roderick, in explaining that my statement that suggesting that Mr. Mikell do garbage collection was not racially motivated but was, quite simply, the archetype of a "dirty job" and I had been instructed to make a "dirty job" reference, I also contrasted my statement with Mr. Tanaka's statement – that Mr. Mikell could work in the fields – which, in my opinion, had overtly racist connotations and I pointed out dryly that unlike Mr. Tanaka, I had not implied Mr. Mikell should pick cotton. Mr. Roderick concluded that my statement illustrated that I was conscious of race. (Given that I was being interviewed in

connection with Mr. Mikell's complaints that I had discriminated against him on the basis of race, Mr. Roderick's conclusion that my statement showed I was conscious of race in that interview is, frankly, circular nonsense.)

37.    Mr. Roderick also asked me about a comment I made to Ms. Cole. It seems that Ms. Cole reported that I stated that to her I used to work in Nashville and told Mr. Roderick that I stated she should go there because she could become the main anchor there. As I told Mr. Roderick, I never made such a statement. I just said it was a great city, a fun market, and a great place to work. Ms. Cole apparently reported that she believed my comment was racist. As I informed Mr. Roderick, Ms. Cole and I had been discussing our past tv markets and I was saying how much I enjoyed Nashville and would go back to work there anytime. I did not suggest, nor imply, that she go to Nashville because I believed it would be a better racial fit for Ms. Cole (i.e., she should go there because she was Black and the audience was largely Black). To my memory, I said to Mr. Roderick that the inference Ms. Cole made was not accurate and that, to my knowledge, Nashville was not a "majority minority" city – *i.e.*, the inference that I identified Nashville as a market for Ms. Cole because there was a largely Black audience was incorrect, as it was not.

38.    Mr. Roderick also informed me of other allegations against me: that I rolled my eyes when talking to people of color and did not welcome people of color when they entered a room. It was not (and is not) clear to me who made these allegations – not least because I do not recall ever rolling my eyes when talking to people of color and would personally be horrified if anyone else did so. As for the allegation that I did not greet people of color when they entered a room: I told Mr. Roderick that when I am busy (as is often the case), I do not greet *anyone* when they enter a room, regardless of their skin color. I otherwise denied the allegation. I still deny the allegation.

39.    I provided Mr. Roderick with the names of two witnesses to Mr. Mikell's loud, public confrontation with me on the studio floor: Ms. Jagolinzer and Mr. Tanaka. Mr. Roderick chose not to speak with either of them, nor did anyone else at WBZ/CBS/Paramount. As a result, Mr. Roderick and CBS failed adequately to investigate and also failed to secure contemporaneous evidence corroborating my complaint that Mr. Mikell had been the aggressor when he confronted me on the studio floor. See Exhibit D.

40.    In addition to offering my perspective on the cited interactions, providing evidence, and identifying witnesses, I also urged Mr. Roderick to speak with my other colleagues of color with whom I had worked closely for decades (including Morning Reporter

Levan Reid[14], WBZ's Morning Tech Director Tisha Wilson, and Mr. Green, Jr.) and who knew me well. (I informed Mr. Roderick that Mr. Green, Jr. worked in the same CBS building in New York as he (Roderick) did and therefore would be particularly easy to reach.) I also submitted a follow-up summary inviting Mr. Roderick to circle back should he have any further questions. (A copy of my follow-up email to Mr. Roderick is attached at **Exhibit F**.)

41. Mr. Roderick did not speak with any of the colleagues or witnesses I identified. Nor did he ask me for any additional information.

42. Rather, in a Zoom conference on Friday, May 17, 2024, Mr. Roderick informed me that he had corroborated the complaints against me and was not able to corroborate the complaint I lodged against Mr. Mikell. He did not give me a copy of his investigation report (if any exists).

43. Immediately after Mr. Roderick signed off the Zoom meeting, Mr. Draper issued a Written Warning to me based on the results of Mr. Roderick's investigation. The Written Warning stated that the witnesses with whom Mr. Roderick spoke about my complaint about Mr. Mikell's confrontation of me on April 3 recalled a matter-of-fact exchange between two colleagues and that no one corroborated my report that Mr. Mikell was loud, confrontational and unprofessional toward me. The Written Warning further stated that one of the witnesses stated that I was the aggressor in the interaction. The Written Warning also stated that Mr. Roderick was of the opinion that I falsely (and only after being informed I was being investigated) complained about Mr. Mikell's behavior toward me with the intent unfairly to portray Mr. Mikell in an unflattering and disparaging way despite the incident not calling for that depiction. I believe that the investigation was biased and not impartial.

   a. Mr. Roderick stated that I was the aggressor in the interaction with Mr. Mikell, even though Mr. Roderick never interviewed Ms. Jagolinzer nor reviewed her text thread that contemporaneously memorialized that Mr. Mikell had confronted me and been the aggressor.
   b. Mr. Roderick did not interview *any* of the other witnesses I identified, including Mr. Tanaka, whom I had specifically identified as a witness to the incident.
   c. Mr. Roderick only spoke with Eric Pearson, the floor manager (who is Black and Mr. Mikell's closest friend at the station) and Ms. Wilson (who also is

---

[14] In 2022, I lobbied WBZ to have Mr. Reid join the Morning Show and, thereafter, I lobbied for him to be made a bigger part of the show. I advocated for WBZ to feature Mr. Reid in promotional pieces. I also advocated WBZ for Mr. Reid to co-anchor with me.

Black) about the incident. In other words, Mr. Roderick spoke only with Black employees about the incident.

d.  Mr. Roderick stated that Ms. Wilson said she did not hear Mr. Mikell confront me, implying that I had lied about Mr. Mikell's confrontation of me. Ms. Wilson informed me, however, that she told Mr. Roderick that she had not heard Mr. Mikell confront me, not because he had not done so but because neither my nor Mr. Mikell's microphone was on. (Ms. Wilson does not work on the floor; she works in an entirely separate room. She also wears a headset to monitor sound in the on-air newscast. As a result, she would have been (was) unable to hear Mr. Mikell's confrontation of me on the floor unless our microphones were on – and the microphones were not on.[15]) Mr. Roderick deliberately disregarded the fact that Ms. Wilson physically *could not* hear the confrontation. Rather, he chose to report that Ms. Wilson did not hear the confrontation and imply that it did not occur and I was lying He also, without having interviewed any of the witnesses I identified, gratuitously opined that I had complained in bad faith / falsely about Mr. Mikell with the intent unfairly to portray him in an unflattering and disparaging way.

e.  As a fair, unbiased investigation would have readily revealed evidence that Mr. Mikell did in fact aggressively and publicly confront me, it is clear that Mr. Roderick did not undertake a fair, unbiased investigation but, instead, had his own agenda.

44.  Other evidence suggests that Mr. Roderick had an agenda to advance in conducting his investigation and concluding I had exhibited microaggressive behavior. Among other things:

a.  He discounted warm text threads between Mr. Mikell and me.  See, e.g., EXHIBIT B.

b.  Even though I informed Mr. Roderick that Mr. Mikell had asked me for pronunciation tips of town names, he discounted this fact, and further discounted my explanation that giving pronunciation tips is a courtesy that people in the industry extend to colleagues they want to help relocate to a new market.

c.  Mr. Roderick elected to interpret my statement that Mr. Mikell would "find your people" as exhibiting unconscious bias rather than as a simple assurance that he would undoubtedly discover and connect with

---

[15] Based on Ms. Wilson's statements to me, I deduce that Mr. Peterson, Mr. Mikell's closest friend at the station, asserted I was the aggressor in the interaction.

individuals who shared similar values, interests, and/or perspectives – i.e., find friends. Mr. Roderick discounted that when I welcomed Mr. Mikell to Boston, I offered to introduce him to my friends, colleagues and acquaintances who are young professionals around his age and who live in Boston, and that I also welcomed him the to meet and socialize with my family.

d.  Mr. Roderick did not speak with any of the Black colleagues with whom I had worked closely, daily and for decades, although I urged him to do so, nor any of the White colleagues I urged him to speak with about Mr. Mikell's confrontation of me. Mr. Roderick elected instead to confine his investigation to Mr. Mikell (who is Black (and had been at WBZ for just over seven months)), the two witnesses Mr. Mikell identified (both of whom are Black), Ms. Cole (who is Black and stood to secure a greater role should Ms. Merrill be demoted or separated[16]) and, apparently, a third person of color whose specific complaint(s) were not identified and were thus indefensible.

e.  Mr. Roderick also did not appear to find it unusual that both Mr. Mikell and Ms. Cole, at the same time, raised complaints, nor did he find it suspicious that Ms. Cole and Mr. Mikell both elected to complain directly to the Legal Department at Paramount, bypassing entirely WBZ's local employee relations teams' complaint and investigation mechanism.

f.  Mr. Roderick did not investigate or even interview Mr. Tanaka in connection with his (Tanaka's) remark during the "Dirty Job" segment, despite my informing Mr. Roderick of the remark, which was laden with racist undertones.

g.  Mr. Roderick gratuitously (and wrongly) opined that I falsely complained about Mr. Mikell's confrontation of me and did so only after I was informed of Mr. Mikell's complaint about me, with the intent unfairly to portray Mr. Mikell in an unflattering and disparaging way despite the incident not calling for that depiction.

45.  The Written Warning that Mr. Draper issued to me, which was based on Mr. Roderick's investigation, stated that my behavior created a very unwelcoming work environment. It stated that Mr. Roderick concluded that my behavior was grounded in microaggressions or unconscious bias. The Written Warning also noted that I would be required to complete unconscious bias training and warned that should I engage in any similar conduct in the future, I would be subject to further disciplinary action

---

[16] And did in fact secure a greater role as a result of WBZ's response to the allegations Mr. Mikell and she levied against me. Ms. Cole has now been promoted and given the 530pm news anchor spot.

up to and including termination. (I was advised by close professional colleagues and senior leaders at SAG-AFTRA that a Written Warning and the requirement that I undertake training were consistent with disciplinary actions taken by CBS in purportedly similar situations.) The Written Warning also stated that the matter was considered closed.

46.    Nevertheless, Mr. Draper then immediately informed me that he would be demoting me from my role as co-anchor of the Weekday Morning Show to working weekend nights, stating that decision "had been in the works for some time" (or words to that effect). That explanation makes no sense, however, for a number of reasons. First, in August 2023, after meteorologist Zack Green was terminated, Mr. Draper told me he valued me and confirmed my job was safe. Second, at the end of March 2024, after my co-anchor Liam Martin left, Mr. Draper again told me he valued and cared about me, and he again confirmed my job was safe. Third, also in March 2024, WBZ aired a promotional piece about my twentieth anniversary at WBZ (hardly the action of an organization planning to demote someone). Fourth, I am aware that at the time of my demotion, a number of additional promotional pieces featuring me were in the works. Fifth, several of my extensive industry contacts (including specifically in CBS management) challenged (disagreed with) Mr. Draper's assertion that my demotion was "in the works for some time," as no changes in WBZ's Morning Show had been planned, discussed, or even rumored, either at WBZ or at CBS headquarters in New York.  I also had never been counseled about my performance.

    a.    Later, counsel for WBZ stated that the findings of the investigation had in fact played a role in the decision to remove me from the Morning Show.

47.    I did not work on Monday, May 20, 2024 (my next regularly scheduled morning time slot), because SAG-AFTRA union rules mandated that I be given two weeks' notice in advance of any schedule change.

48.    That same day (i.e., Monday, May 20, 2024), Mr. Draper publicly announced to WBZ personnel – many of whom were aware of the investigation into me, as rumors about it had been circulating (not at my hand) – in two separate staff meetings, that I had been demoted. Demoting me, particularly in the context of the investigation into me, sent the false message to my professional colleagues that I had engaged in serious wrongdoing. Moreover, to the best of my memory, Mr. Draper had not similarly announced the prior demotions of any other (male) anchors at WBZ. Because Mr. Draper handled the announcement so poorly (and so differently than how he handled the announcements of other demotions at WBZ, particularly including the demotions of men), it led to wild speculation and rumors that damaged my reputation. See **Exhibit G** and **Exhibit H**.

49.  My professional colleagues and senior leaders at SAG-AFTRA (and I) believe that I was being punished and made an example of, as a way for CBS to make up for its sordid history of racism, in that the demotion was wildly disproportionate to disciplinary actions taken by WBZ/CBS/Paramount against others, historically – particularly men. Specifically,

   a.  Mr. Tanaka (who is an Asian male) was not demoted for his remark on the "dirty job" segment.
   b.  Mr. Mikell (who is a Black male) was not disciplined whatsoever for making a wildly inappropriate sexually-charged comment about me on live television nor for publicly and aggressively confronting me on the studio floor.

50.  My professional colleagues and senior leaders at SAG-AFTRA told me that the demotion constituted "career sabotage" from which my career would never recover. In brief, the demotion was career ending.

51.  Because of the catastrophic damage a demotion would have caused my career, especially in the context of allegations that I was racist, on May 24, 2024, I gave notice of constructive discharge resignation, effective immediately.

52.  It is my belief that because of my race (and the race of those who complained about me), I was discriminated against, subjected to a biased and disparate investigation, and unlawfully constructive discharged by the named Respondents. I was also subjected to disparate treatment in discipline.

53.  It is also my belief that because of my gender, I was discriminated against, subjected to disparate treatment in discipline compared to my male colleagues.

54.  As a result of the conduct described above, I have suffered lost wages, lost benefits, severe reputational harm because of the utterly false allegations that I am racist, severe emotional distress, and I have incurred attorney's fees.

55.  Based on the actions described above, I therefore charge:

   a.  Respondents with discrimination on the basis of Race, in violation of G.L. c. 151B, § 4(1) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.;

   b.  Respondents with discrimination on the basis of Gender, in violation of G.L. c. 151B, § 4(1) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.;

c. Respondents with failure to conduct an unbiased thorough investigation into my complaints of discrimination in violation of G.L. c. 151B; and

d. Respondents Messrs. Draper and Roderick with interfering with my protected rights in violation of M.G.L. c. 151B, § 4(4A).

I ALSO WANT THIS CHARGE FILED WITH THE EEOC:  X

I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY CHARGE IN ACCORDANCE WITH THEIR PROCEDURES.

**Verification**

Consistent with 804 CMR 1.04(5)1 hereby certify and affirm, under oath and the pains and penalties of perjury, as follows: (a) I have reviewed this Complaint of Discrimination; (b) with respect to the facts that pertain to me in the foregoing, of which I have personal knowledge, I affirm that such information is true and correct; and (c) with respect to the facts in the complaint that pertain to me and of which I do not have direct personal knowledge, I affirm upon information and belief, that such information is true and accurate.

Signed under the pains and penalties of perjury, this 16th day of September 2024.

/s/ Katherine Merrill Dunham
(SIGNATURE OF COMPLAINANT)